IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| SHERRI PURVIS INDIVIDUALLY AND AS NEXT FRIEND AND NATURAL GUARDIAN FOR JAMES C. PURVIS, <br><br> Plaintiffs, <br><br> vs. <br><br> BLITZ USA, INC., WAL-MART STORES, INC., WAL-MART STORES EAST, L.P., and WAL-MART STORES EAST, INC., <br><br> Defendants. | C/A NO.: 7:1 1-CV-00111-HL |

## MOTION TO EXCLUDE TESTIMONY BY PLAINTIFF'S EXPERT DAVID RONDINONE

### PRELIMINARY STATEMENT

This motion rests on a very basic aspect of the *Daubert* analysis: An expert's opinion must be based on sufficient information, and if it is not, the analysis is unreliable. Dr. David Rondinone has testified that it is more likely than not that the gasoline vapors in the portable plastic consumer gas container the Plaintiff was misusing at the time of the accident were within the "explosive range"—a critical scientific requirement for combustion to occur. But, based on his own description of the data needed to form such an opinion, Dr. Rondinone does not have the necessary information to support his conclusion. The Court should therefore preclude Dr. Rondinone from testifying that it is more likely than not that the gasoline vapors in the subject gas container were within the explosive range at the time of the accident.

-1-

## BACKGROUND FACTS

In January 2011, James Purvis poured gasoline from a Blitz five gallon portable plastic gasoline container onto burning paper in a 55 gallon drum. Purvis contends the container was purchased from a Wal-Mart store in Fitzgerald, Georgia. Purvis made two consecutive pours into the barrel, making the second even though he had already seen flames in the barrel. Predictably, a conflagration resulted from Purvis's misuse of the gasoline from the Blitz container.

Purvis insists the Blitz container "exploded," spilling burning gasoline onto his lower extremities. Purvis is the only witness who claims to have actually seen the container explode during the brief time after the flare up and before he threw himself to the ground. The container was destroyed in the resulting fire, and it is undisputed that the remnants give no indication one way or the other whether the container actually exploded or simply melted from the fire. Testimony by other witnesses is at best inconclusive.

## ARGUMENT AND AUTHORITIES

**1.      Under *Daubert*, an expert's opinion must be based sufficient information.**

When an expert's opinion is based on insufficient information, the analysis is unreliable and therefore inadmissible under *Daubert*. *U.S. v. Frazier*, 387 F.3d 1244, 1275 n. 10 (11th Cir. 2004); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). An expert must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). In opining, based on insufficient information, that it is more likely than not that the gasoline vapors in the subject gas container were within the explosive range at the time of the accident, Dr. Rondinone is not using the same level of intellectual rigor that characterizes the practice of a mechanical engineer outside of the courtroom.

**2.     Dr. Rondinone does not have sufficient information to support his opinion.**

Under Dr. Rondinone's theory, gasoline vapors in a portable plastic consumer gasoline container can be explosive when a number of critical variables all fall into place. Dr. Rondinone does not have enough information, however, to opine that all of these variables fell into place during the accident in this lawsuit. His Rule 26 Report and CV are attached as Exhibit 1.

**A.     The data needed to conclude that gasoline vapors in a container are within the explosive range.**

The parties agree to the basic (and obvious) scientific principle that for gasoline vapors to ignite, they must be within the ignitable range. If there is too much gasoline vapor in the headspace of the container (the space above the liquid), or if there is too little, ignition is impossible. That is to say, the "vapor concentration" must be in the required flammable range for anything even theoretically to occur. Plaintiff's theory is that the gasoline in the container evaporated or "weathered" in large part because the cap was left off the spout over some period of time. This "weathering" supposedly allowed the gas can's headspace which would have started off too "rich" with gas vapor, to ignite, to later enter the flammable range at some point in time.

According to Dr. Rondinone's theory, the key variables are the starting volume of the gasoline in the container, the age of the gasoline at the time of incident, the daily temperature variations over the gasoline's life span in the container, and the ending volume of the gasoline in the container. (Exh. 2 at 68-69, 97-100, 160). All of these factors critically affect the resulting gasoline "vapor concentration" in the headspace. How these factors apply in Dr. Rondinone's theory is discussed more below, but first it is necessary to consider whether he has reliable information on variables he identifies as necessary to his theory.

### B. The witnesses can only guess about the data Dr. Rondinone needs.

There are two main sources of the information Dr. Rondinone needs to conclude that the gasoline vapors in the subject container were, under his theory, within the explosive range: Dusty Purvis, the container's owner, and James Purvis, the plaintiff who knowingly poured gasoline from the container onto a fire. Dusty Purvis is most knowledgeable about the starting volume of the gasoline, extractions of gasoline over its life span in the container, and the information needed to postulate the daily temperature variations over the life of the gasoline in the container. And to say that Dusty Purvis was unable to offer much, if any, helpful information on these points is to put it generously.

Dusty Purvis's testimony on the history of the gasoline in the container covers relatively few deposition pages. (Exh. 3 at 26-44). Throughout those pages, Dusty—who admits more than once that "I'm not good with dates, man, horrible with dates" (*Id*. at 28, 29)—can only guess at the information Dr. Rondinone needs to reach his conclusion. Early on, Dusty guessed that he filled the container four months before the accident. (*Id*. at 27-28). But he also guessed that it might have been one year. (*Id*. at 26, 30, 37-38). Eventually, he admitted "I mean, I don't remember when I got the gas." (*Id*. at 36).

Dusty also could not give helpful information about the use of gasoline from the container over the gasoline's life span in the container. (*Id*. at 33). He knew that he poured some gas from the container into his motorcycle, but he could not say when he did so or how much he poured. (*Id*. at 36-38). And he had to guess at the amount of gasoline remaining in the container on the date of the accident. (*Id*.). Likewise, James Purvis could only guess at how much gasoline was in the container when he poured some onto the fire. (Exh. 4 at 35). He testified that on the day

of the accident, the container "probably didn't even weigh a pound." (*Id*. at 36). But it is undisputed that an empty five gallon Blitz container like the one in question weighs more than a pound. Informed of that fact, James guessed there was "maybe" half an inch of gasoline in the container, though he did not look inside of it. (*Id*. at 37).

Finally, there is a paucity of data from which to determine temperature variations over the (unknown) life span of the gasoline in the subject container. In fact, Dr. Rondinone's report makes no effort to even *estimate* the actual temperature variations into his analysis. Yet he admitted that daily temperature variations are a key consideration in determining whether gasoline vapors in a container are within the explosive range. (Exh. 2 at 28, 97-98). He also admitted that given the temperature variations in south Georgia, where the gasoline in question was stored, the time period during which the gasoline might be within the explosive range could be much shorter than shown in his experiments in Berkeley, California. (*Id*. at 32).

**C. Dr. Rondinone's theory requires that he have more accurate information than is available.**

Dr. Rondinone's report summarizes his theory this way: "Experimental testing of gasoline in plastic gasoline storage containers has demonstrated that at lower temperatures, the equilibrium concentration of gasoline vapor in a plastic storage container will decrease. Low temperature, small amount, aging, or a combination of these, can lead to a concentration of gasoline vapor inside of a storage container in the explosive range." (Exh. 1 at 4). Without better information on the length of time the gasoline was in the container, the occurrences when some of the gasoline was poured out of the container before the accident, the temperature variations over the gaso-

line's life span, and the volume of gasoline at the time of the accident, Dr. Rondinone cannot reliably opine that the vapors were within the explosive range when the accident occurred.

Dusty Purvis guessed that he completely filled the subject five gallon Blitz container sometime between four months and one year before the accident. He also guessed that on more than one occasion he filled his motorcycle's gas tank with fuel from the container during that 4 or 12 month period. Dusty and James Purvis both guessed there was about one-half gallon remaining in the container on the day of the accident, but the evidence is at best highly contradictory as to how long the gasoline level in the container was approximately half a gallon. Dr. Rondinone conceded that "[w]e don't really know the last time [Dusty] used it." (Exh. 2 at 98). This is critical because as Dr. Rondinone testified, "the aging would actually be impacted by how much gasoline is present at any one time." (*Id*. at 97).

If Dusty is correct that the container was filled four months before the accident, and he filled his motorcycle gas tank from the container more than once during that four months, then for Dr. Rondinone's theory to be even plausible, he must know how much gasoline was removed from the container and when. For example, if four gallons were used to fuel the motorcycle before the accident, leaving one gallon in the container 30 days before the accident, then Dr. Rondinone's theory does not suggest the gasoline vapors in the container would have been within the explosive range. (*See* Exh. 2 at 104-05). This is because it would take more than 30 days for one half gallon of the gasoline to evaporate and leave the half gallon that Dusty and James Purvis guessed might have remained in the container at the time of the accident. (*Id*.).

The point is, Dr. Rondinone simply does not have sufficient information to opine that it is more likely than not the vapors were within the explosive range. Moreover, he has not attempted

to devise a specific weathering formula to fit the facts of this case even though it is something "any engineer" could do. (*Id*. at 99-104). Nor has he conducted any tests replicating the known facts of this case, even though "you actually could do that if you wanted to." (*Id*. at 155, 175). Instead of taking these steps, Dr. Rondinone is content to rely on insufficient data because his theory supposedly fits with the Plaintiff's testimony that the container in question exploded on the day of the accident. *Daubert*, however, does not permit this sort of bootstrapping.

**3.   The gaps in Dr. Rondinone's analysis cannot be overlooked merely because his conclusion is purportedly consistent with lay testimony about the accident.**

Dr. Rondinone did not bother to exercise the same level of intellectual rigor that characterizes the practice of an expert in the relevant field because he insists his theory is confirmed by some witness testimony that he believes supports the conclusion that the container exploded on the day of the accident. (*See* Exh. 2 at 86-87, 112-14). This subjective lay testimony, however, cannot be confirmed by the physical evidence because the container was destroyed in the conflagration that predictably ensued after the Plaintiff poured gasoline on a fire. (*Id*. at 196-97). More importantly, an expert cannot plug gaps in his analysis by pointing to subjective lay testimony thought to be consistent with the conclusion he has drawn.

An expert cannot skip intermediate steps in his or her analysis and proceed directly to a conclusion merely because that conclusion is consistent with lay testimony or other factual evidence. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244-45 (11th Cir. 2005). And if intermediate steps in the analysis cannot be completed because of insufficient data, the expert's conclusion is not reliable and admissible merely because it is consistent with lay testimony or other factual evidence. *Id*. Failure to show the reliability of each of the steps in the analysis "is a fatal defect under *Daubert*." *Id.*

Dr. Rondinone's inability to perform the intermediate steps of the required "explosion analysis," due to the lack of necessary data, means he cannot testify that it is more likely than not that the vapors in the subject gasoline container were within the explosive range. And it would not be helpful to the jury for Dr. Rondinone to simply parrot what James Purvis said—that the container exploded.[1] Rondinone has no independent basis to draw that conclusion because of the gaps in his analysis and the fact that, as Dr. Rondinone admits, the container remnants do not indicate one way or the other whether there was an explosion. (Exh. 2 at 196-97).

## CONCLUSION

For the foregoing reasons, Defendant Wal-Mart requests that the Court preclude Plaintiff's expert Dr. Rondinone from testifying that it is more likely than not that the vapors in the subject gasoline container were within the explosive range on the date of the accident in question or that the container "exploded" after Plaintiff poured gasoline on a fire.

Respectfully submitted this 26th day of November 2012.

**HAWKINS PARNELL  
THACKSTON & YOUNG LLP**

By: *Michael J. Goldman*  
Michael J. Goldman  
Georgia Bar No. 300100  
Warner S. Fox  
Georgia Bar No. 272654  
303 Peachtree Street, N.E., STE 4000  
Atlanta, Georgia 30308-3243  
Phone: (404) 614-7400  
Fax: (404) 614-7500  
mgoldman@hptylaw.com  
wfox@hptylaw.com  
**ATTORNEYS FOR WAL-MART DEFENDANTS**

---

[1] The ability for one to actually see such an event as described by James Purvis−if it actually occurred−is highly doubtful, at best.

–9–

## CERTIFICATE OF SERVICE

I certify that on November 26, 2012, I submitted the above to all counsel of record by United States Postal Service and Electronic mail:

Brady R. Thomas, Esq.
Daniel Haltiwanger, Esq.
Terry Richardson, Esq.
RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC
Post Office Box 1368
Barnwell, SC 29812
bthomas@rpwb.com
dhaltiwanger@rpwb.com

                                          s/*Michael J. Goldman*
                                          Michael J. Goldman
                                          Georgia Bar No. 300100